# COURT OF APPEALS OF VIRGINIA

**Record No. 1489-24-2**

MITCHELL IRA YOUNG

v.

COMMONWEALTH OF VIRGINIA

Present: Chief Judge Decker, Judges Ortiz and Callins

Argued at Richmond, Virginia

Opinion Issued June 9, 2026

## FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Richard B. Campbell, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia Indigent Defense Commission, on briefs), for appellant.

Jennifer L. Guiliano, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE DOMINIQUE A. CALLINS</u>

Mitchell Ira Young appeals his convictions for robbery and use of a firearm in the commission of the robbery. He argues that the trial court should have suppressed in- and out-of-court identifications as suggestive and unreliable and granted his proffered jury instruction about eyewitness identifications. He also contends that the evidence was insufficient to prove his identity as the robber. We disagree and hold that the eyewitness identification was not suggestive, that his proffered instruction was appropriately denied, and that the evidence was sufficient to prove identity. Thus, we affirm the trial court's judgment.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

Young was playing a "skill game" in a convenience store, when James Woody, a machine service technician, approached him to collect money from the machine.[3] Woody and Young had encountered each other in the same store, "once, maybe twice before." The two were standing about three feet apart, and though Young wore a mask, he had it pulled down around his neck, exposing his entire face to Woody. When Woody explained that he needed to work on the machine, Young gathered his things and walked out of the store.

Ten minutes later, Young reentered the store with his mask pulled up, "put a gun to [Woody's] face, and said, give me the fucking bag." Woody "tossed the bag over to him," which contained the proceeds from two stores, totaling "between $30,000 to $40,000." Young walked out, and Woody called the authorities.

Richmond Police Detective Mark Hatchett arrived at the scene and interviewed Woody. Woody described the robber as a "Black male, 32 years old, 5'9, skinny, red/blue/black mask, hood, black Jordan jacket, blue jeans, black shoes, red baseball hat, with a black belt[, and] armed with a handgun." Detective Hatchett estimated the robber's weight from the store's surveillance video, but he could not determine his eye color or whether he had any tattoos.

_____

[2] When reviewing the denial of a motion to suppress and a motion to strike, we view the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). However, "[w]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (alteration in original) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 260 (2018)). We unseal facts found in the sealed record only to the extent we discuss them. *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[3] The record does not define a "skill game," but Woody described servicing the machines by "collecting cash from" them and checking to ensure that "they were operating properly with paper" and that the machines were "playable."

Surveillance footage from the parking lot and inside the store corroborated Woody's account of the events. It showed Young leaving the store and a "white Chevy Equinox rental vehicle with Florida plates arriving at the business seconds before the robbery." Detective Hatchett explained the video showed Young "walk out of the store when he initially left, and then return[] in this vehicle wearing the same clothes that he had on, and proceed[] to rob the victim seconds after he turns the corner into the store." Police were able to view the Equinox's Florida license plate through the Flock camera system, which records license plate images "throughout the country at various locations, street corners, [and] intersections." They learned that Young's mother had rented the Equinox and that the only other known driver of the Equinox was Young's son, who was at school during the robbery and did not match the robber's description.

Based on this information, police determined Young fit the description of the robber and assembled a photo lineup with seven photographs of men of the same race, within four or five years of Young's age and with similar "facial characteristics." The fillers were based on Young's actual age, 40, rather than on Woody's estimate of the robber's age, 32, "in order to [ensure] that the lineup [was] fair, unbiased, and [did not] highlight the suspect in any[ ]way." Detective Hatchett administered the lineup with Woody 15 days after the robbery. Detective Hatchett explained that he had "to go through all of [the photos]" and that he could "come back to" photographs if Woody believed he recognized someone. He showed the photographs to Woody sequentially, placing each one face down before showing the next. Woody first stopped on the photograph of Young, the second one shown. Detective Hatchett told Woody, "[L]et's go through the rest of them," and they did so. Woody then said that "he wanted to look at the pictures again." Woody "flipped through them again and got to number two and identified Mr. Young as the man who robbed him." He circled that photograph, wrote down the circumstances when he saw Young, and signed and dated the photograph.

Young moved to suppress Woody's out-of-court and future in-court eyewitness identification, claiming the single-blind out-of-court identification was impermissibly suggestive. At a hearing, Detective Hatchett indicated that he was the only officer available to administer the lineup when he finished preparing it. He did not want to wait any longer to administer it because if he "let days drag on" the victim's memory may have faded. He explained that the Department suffered from a staffing shortage, noting that "[a] year ago [they] had ten people in [their] offices and detectives," but that as of the hearing date, they had four. And on the day of the lineup, he could only recall "probably . . . five" officers being on duty. He also agreed that, over the course of the investigation, "there were several detectives who were involved who knew who the true suspect was," which also "limited who was available" to show Woody the array.

After hearing further testimony from Detective Hatchett, the trial court denied Young's motion. Detective Hatchett clarified that he did not hand Woody the photograph of Young "any differently than any of the others." He did not say anything to Woody when he passed his photograph or while Woody held it. And he did not "make any noises," "breathe any differently," "make any hand gestures" or "facial expressions," or "make any indication about who the true suspect was" while Woody held the photograph of Young. In fact, he "never informed [Woody] that he had selected the true suspect." Based on these facts, the trial court found that the photo lineup was not suggestive.

At trial, Woody identified Young as the robber. He agreed that he told police that the robber had a face tattoo. But he acknowledged that he did not see a tattoo on Young's face at trial, and he admitted he had been mistaken about that detail. He confirmed that he recognized the "eyes" and other "facial features" in the photograph of Young that he identified as the robber for the police.

After the Commonwealth rested, Young moved to strike her evidence, arguing that the Commonwealth failed to prove the robber's identity. The trial court denied the motion. After submitting a current photograph of himself, Young rested and renewed his motion to strike, but the court again denied it.

Young proffered a lengthy instruction for the jury's consideration when weighing eyewitness identification. The instruction emphasized the jury's role in evaluating an eyewitness's credibility and the weight to be given their testimony. To this end, it counseled that the jury should consider (1) the witness's opportunity to observe the perpetrator of the robbery, (2) the witness's intelligence and memory, (3) outside influences affecting the witness's identification, and (4) procedures used by police in obtaining the witness's identification. But it ultimately reiterated that the jury, alone, had the duty to "determine what weight to give" the eyewitness identification testimony. Finding that the other instructions sufficiently addressed the matters raised in this proffered instruction, however, the trial court refused Young's instruction.

The jury convicted Young of robbery and using a firearm in the commission of a robbery. This appeal followed.

ANALYSIS

I. Eyewitness Identification

Young argues that the in- and out-of-court identifications were tainted by unnecessarily suggestive procedures. Reviewing the legal question de novo but deferring to the trial court's factual findings, we disagree. *Ray v. Commonwealth*, 74 Va. App. 291, 302 (2022).

An identification procedure violates due process only when the method is "*both suggestive and unnecessary.*" *Sample v. Commonwealth*, 303 Va. 2, 10 (2024) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012)). Officers may render out-of-court identification procedures unduly suggestive by insinuating they have "other evidence that one of the persons

pictured committed the crime" or by having only the defendant reappear in successive lineups. *Id.* at 11 (quoting *Simmons v. United States*, 390 U.S. 377, 383 (1968)). But in-court identifications following a pretrial identification may nonetheless be admissible "if the origin of that [in-court] identification is independent of the inadmissible out-of-court identification procedure." *Hill v. Commonwealth*, 2 Va. App. 683, 693 (1986).

Here, the record is devoid of evidence that Detective Hatchett made comments or engaged in conduct meant to make Woody's identification of Young "virtually inevitable." *Sample*, 303 Va. at 11 (quoting *Foster v. California*, 394 U.S. 440, 443 (1969)). Yet Young dismisses Detective Hatchett's testimony, insisting that his "unintentional, subtle, non-verbal cues" during the lineup told Woody that Young was the robber. But Young's insistence amounts to no more than conjecture of a *risk* of suggestive behavior. Conjecture, alone, is fatally insufficient to justify suppressing the out-of-court identification. If it were otherwise, then every criminal defendant identified in a single-blind photographic lineup could "cry wolf" and thus manipulate the evidence against him.[4]

Instead, Young bore the burden of establishing that the lineup rose "to a level of suggestiveness that undermine[d] the identification's reliability." *Sample*, 303 Va. at 10. His mere suspicion about the procedure's efficacy fails to meet this burden since "[i]t is not enough that the procedure 'may have in some respects fallen short of the ideal.'" *Id.* (quoting *Sexton v. Beaudreaux*, 585 U.S. 961, 966 (2018) (per curiam)). To the contrary, barring evidence of suggestiveness, Young was entitled to "persuade the [jurors] that the evidence should be

---

[4] Young also argues that we should *presume* that Detective Hatchett's procedure was suggestive since he did not record the identification. He made no such argument at the suppression hearing. His failure to preserve this issue bars our consideration of it. Rule 5A:18. And though Rule 5A:18 has its exceptions, Young has not invoked them, and we do not do so sua sponte. *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023).

discounted as unworthy of credit" based on his theory that non-double-blind identifications are inherently suggestive. *Perry*, 565 U.S. at 237. And, clearly, he failed to so persuade them.[5]

Young's only challenge to the in-court identification is that it was not "independent of the inadmissible out-of-court identification procedure." Because we hold the out-of-court identification was admissible, his in-court identification challenge also fails. Thus, the trial court did not err in denying his motion to suppress.

II. Jury Instructions

Next, Young contends the trial court abused its discretion by denying his proffered eyewitness-identification jury instruction. We disagree.

We review a trial court's denial of jury instructions for an abuse of discretion, but we review de novo whether the instructions state the relevant law accurately. *Holmes v. Commonwealth*, 76 Va. App. 34, 53 (2022); *Watson v. Commonwealth*, 298 Va. 197, 207 (2019). We inquire whether the instructions clearly state the law and cover "all issues which the evidence fairly raises." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). More than a scintilla of evidence must support a proffered jury instruction. *Payne v. Commonwealth*, 292 Va. 855, 869 (2016). But even where such evidentiary support exists, we do not reverse the trial court's decision if the "granted instructions fully and fairly cover" the same legal principles. *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (quoting *Daniels v. Commonwealth*, 275 Va. 460, 466 (2008)).

---

[5] By concluding Detective Hatchett's single-blind identification was not suggestive, we obviate the need to address whether the procedure was also unnecessary and unreliable. *See Sample*, 303 Va. at 12 ("Accordingly, due process does not require any further finding of the identification's reliability because it was not procured by impermissibly suggestive methods."); *see also Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

Young proffered the same jury instruction as the defendant in *Watson*. There, our Supreme Court recognized that more than a scintilla of evidence supported granting it and that it accurately stated the law. *Watson*, 298 Va. at 210. But the Court held that the trial court did not abuse its discretion by refusing the instruction. *Id.* The trial court instructed the jury (1) "on its role as the judges of the facts, the credibility of the witnesses, and the weight of evidence," and (2) about "the presumption of innocence and the Commonwealth's burden of proving appellant's identity beyond a reasonable doubt." *Id.* Those instructions adequately addressed the defense's theory on eyewitness testimony. *Id.*

The same conclusion applies here. The given instructions explained to the jury that the presumption of innocence applies and that the Commonwealth bears the burden to prove the defendant's identity beyond a reasonable doubt. The trial court also instructed the jurors on their role as "the judges of the facts, the credibility of the witnesses, and the weight of the evidence." The court further instructed them to consider an eyewitness's "*opportunity for knowing the truth and for having observed the things about which they testified*." (Emphasis added). Taken together, these instructions addressed an eyewitness's belief and also their "capacity and opportunity to accurately and reliably form that belief."[6] *Payne*, 292 Va. at 871. Therefore, just as in *Watson*, the given instructions adequately covered Young's theory of defense regarding identity and eyewitness identification.

Young's argument, that *Watson* is distinguishable because the instructions had no "mention of a cross-racial identification," lacks force since he offered no evidence at trial

---

[6] In his reply brief and at oral argument, Young disagreed with the Commonwealth's assertion relying on *Payne v. Commonwealth* that a credibility instruction could encompass a reliability instruction. Young instead argues that the *Payne* statement on "capacity and opportunity" is merely dicta and he disagrees with its proposition. We disagree and find the lines in *Payne* are binding upon this Court, holding that a credibility instruction with this same language fully encompasses reliability as well. 292 Va. at 871.

implicating the issue. The same conclusion applies to his complaints that the given instructions did not address "memory in eyewitness identification." Again, Young presented no evidence at trial on the issue. Young is entitled to instructions on his theories of the case only if there is "*some appreciable evidence*" supporting those theories. *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015) (quoting *Harris v. Commonwealth*, 134 Va. 688, 695 (1922)). Not even a scintilla of evidence supports these theories, so the trial court appropriately refused instructions relating to them.[7]

III. Sufficiency

Young argues that the evidence failed to establish his identity as the robber. Again, we disagree.

We review the sufficiency of the evidence to determine whether the jury's verdict was plainly wrong or without evidentiary support. *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017). Our principal concern is "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (emphasis added) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

The Commonwealth bears the burden of proving Young's identity as the robber beyond a reasonable doubt. *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013). When reviewing whether she carried this burden, we do not distinguish between direct and circumstantial evidence. *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017). "Circumstantial evidence is as

_____

[7] Young also argues that the given instructions were insufficient because they did not instruct the jury on "a sincere but mistaken identification" or that "police procedures had any influence on a witness's identification." But Young did not present either of these arguments to the trial court as a reason to give his proposed instruction, so he did not preserve these arguments for appellate review. Rule 5A:18; *Banks v. Commonwealth*, 67 Va. App. 273, 285 (2017) ("[M]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review." (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc))).

competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing." *Montague v. Commonwealth*, 40 Va. App. 430, 439 (2003) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 272 (1979)). Circumstantial evidence may establish that the accused's *motive* to commit a crime existed at the *time* when the crime occurred, and that the accused was present in the *place* of the crime while possessing the *means* to carry it out. *See Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985). When viewing evidence of these circumstances in the aggregate, their "'combined force . . . may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that [an accused] is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (second alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

The jury's finding that Young was the robber was not plainly wrong or without evidentiary support. Woody unequivocally identified Young as the man who robbed him. Though Woody acknowledged he misremembered certain details about the robber, the jury was entitled to "resolve conflicts in the testimony" and to "weigh the evidence." *Wagoner v. Commonwealth*, 63 Va. App. 229, 256 (2014). The jury also considered surveillance videos showing Young "walk out of the store when he initially left, and then return[] in this vehicle wearing the same clothes that he had on, and proceed[] to rob the victim seconds after he turn[ed] the corner into the store." Flock cameras captured the Equinox rented by Young's mother "arriving at the business seconds before the robbery" and evidence eliminated Young's other family members as the driver. These facts, taken together, are sufficient to sustain the jury's verdict. *Reed v. Commonwealth*, 85 Va. App. 196, 207 (2025).

CONCLUSION[8]

For the foregoing reasons, we affirm the circuit court's judgment and remand solely to correct the clerical error in the sentencing order. *See supra* note 8.

*Affirmed and remanded.*

---

[8] The trial court's sentencing order does not suspend any time, but the order's sentencing summary reflects ten years suspended. At the sentencing hearing, the trial judge stated that he would "leave alone the seven-year sentence [for robbery] and with respect to the use of a firearm, I also leave alone the three-year sentence." Though the trial court's oral statements align with its order, the sentencing summary contradicts the court's judgment. Because the trial court's sentencing order is "demonstrably contradicted" by the order's sentencing summary, we remand the case for the limited purpose of correcting this apparent clerical error. *Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 283 (2002); *see also* Code § 8.01-428(B); *Bagley v. Commonwealth*, 73 Va. App. 1, 30 n.10 (2021).